J-S46018-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: S.C.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: M.P., MOTHER | : | |
| | : | No. 1032 WDA 2023 |

Appeal from the Order Entered August 1, 2023
In the Court of Common Pleas of Cambria County Orphans' Court at
No(s):  No. 2023-101-IVT

| | | |
|---|---|---|
| ADOPTION OF: M.C.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: M.P., MOTHER | : | |
| | : | No. 1033 WDA 2023 |

Appeal from the Order Entered August 1, 2023
In the Court of Common Pleas of Cambria County Orphans' Court at
No(s):  2023-100-IVT

| | | |
|---|---|---|
| IN RE: ADOPTION OF: L.T.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: M.P., MOTHER | : | |
| | : | No. 1034 WDA 2023 |

Appeal from the Order Entered August 1, 2023
In the Court of Common Pleas of Cambria County Orphans' Court at
No(s):  2023-99-IVT

BEFORE:  DUBOW, J., MURRAY, J., and SULLIVAN, J.

J-S46018-23

MEMORANDUM BY MURRAY, J.:                    **FILED: January 29, 2024**

M.P. (Mother) appeals from the orders granting the petitions to involuntarily terminate her parental rights to S.C.P. (a daughter born in March 2013), M.C.P. (a daughter born in January 2012), and L.T.P. (a son born in March 2010) (collectively, Children), filed by S.P. (Aunt), so that Aunt may adopt Children.[1]  We affirm.

Cambria County Children and Youth Service (the Agency) removed Children from Mother's care on February 21, 2018.  "[L.T.P.], who at the time was seven years old, had contacted 911 due to [Mother] being unresponsive."  N.T., 4/10/23, at 6.  The supervisor for the family's case, Melisa Lutch, stated the home was in "deplorable condition," explaining that there were needles, medication bottles, empty stamp bags, and other drug paraphernalia within reach of Children.  *Id.* at 6-7.  The Agency filed dependency petitions as to

_____

[1] Aunt is Children's paternal aunt and legal guardian.  Children's father, J.P. (Father), is deceased.  According to Aunt, Father died in a car accident in which Mother was driving their vehicle while under the influence of alcohol. *See* N.T., 4/10/23, at 33-34.

- 2 -

each child, which were granted.[2, 3]  The Agency provided various services to Mother until approximately July 2019.

On July 31, 2019, the juvenile court concluded Mother had not complied with her permanency plan and was "in the process of losing her home" due to her inability to pay bills.  *Id.*, Petitioner's Exhibit 3 (Permanency Review Order).[4]  The court also changed Children's permanency goals from reunification with Mother to "placement with a fit and willing relative."  *Id.*  At that time, the Agency retained legal and physical custody of Children, and Children remained in foster care.  *Id.*

Children were placed with Aunt in August 2019.  The Agency ceased providing services to Mother, but it provided monitoring services during Children's initial placement with Aunt.  On November 19, 2019, the orphans' court terminated the Agency's supervision, including legal and physical

---

[2]  Because the dependency and permanency review proceedings are memorialized at separate juvenile court documents, we are unable to confirm the date on which the juvenile court adjudicated Children dependent. However, other pertinent materials from those proceedings, including the permanency review orders and the termination of supervision orders discussed *infra*, were made part of this record during the termination hearings.

[3]  Mother's youngest child, N., was also placed in the Agency's care based on the same incident.  N. is Children's half-sibling, *see* N.T., 4/10/23, at 13.  Ms. Lutch testified that N. was placed in foster care, and ultimately, Mother's parental rights as to N. were terminated in July 2020.  *Id.* at 14.  The termination of Mother's rights as to N. are not at issue in this appeal.

[4]  The court issued a separate permanency review order as to each child.  Each order is docketed separately, but bears the same exhibit numbers.

custody, of Children. *Id.*, Petitioner's Exhibit 4 (Order for Termination of Court Supervision). The court specified that Mother would have no visitation rights with Children until she successfully completed drug and alcohol treatment. *Id.* If Mother completed treatment, she could request monthly supervised visitation in the community. *Id.*

Mother maintained contact with Children, but her contact became more inconsistent. Mother only requested three visits with Children in 2022. In January 2023, Mother filed a complaint for custody of Children. *See* N.T., 6/7/23, Respondent's Exhibit 1 (Complaint for Custody). On January 27, 2023, Aunt filed petitions to terminate Mother's parental rights as to each child pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (b).

The orphans' court conducted hearings on the custody complaint and termination petitions on April 10, June 7, and June 29, 2023. Children were represented by appointed counsel, Suzann Lehmier, Esquire.[5] The court heard testimony from Ms. Lutch; Chris Maul, the program director for the Day

---

[5] Attorney Lehmier testified,

> Due to the ages of the [C]hildren, [who were 13, 11, and 10 years old at the time,] I was able to speak with them regarding this proceeding and the matter here before the [c]ourt. They were also able to communicate with me their preference as to this matter …, and I can represent to the [c]ourt that I do not believe there would be any conflict between their best interests and legal interests being represented concurrently here today.

N.T., 4/10/23, at 3.

Reporting Center (DRC)[6] in Cambria County; Aunt; Mother; Children's maternal grandfather; Mother's sister; and all three Children. On July 31, 2023,[7] the orphans' court issued orders terminating Mother's parental rights, and made the following findings:

> 3. [Children have] been in the care and custody of [Aunt] pursuant to a court order for termination of court supervision dated November 19, 2019. Previously[, Children] had been in [Aunt's] care under the supervision of [the Agency].
>
> 4. Mother has not resolved and does not appear able to resolve in a reasonable and realistic time period the conditions which led to the removal and placement of [Children].
>
> 5. There does not presently exist a strong bond between Mother and [Children]. Severance of what little parent-child [bond] exists would not be against the best interest and welfare of [Children].
>
> 6. [Children have] indicated a desire to be adopted by [Aunt]. There exists a strong bond between [Children] and [Aunt,] with whom [Children have] resided for over four years.
>
> 7. Terminating the parental rights of [Mother] will not have a detrimental effect on [Children].

---

[6] Mr. Maul described the DRC:

> The [DRC] is a re-entry program that is for [probationers and parolees]. They have to report daily. They have different classes that they have to do during the week; daily check-ins. They do their drug screens there. As they progress through the program, their days they have to be there are reduced until they complete all the requirements and graduate from the program.

N.T., 4/10/23, at 21; **see also id.** at 26 (stating, "The DRC is an alternative to Cambria County Prison. We are licensed as an intensive outpatient" facility).

[7] The orphans' court issued an identical order as to each child, and all orders were docketed on August 1, 2023.

8. There is no conflict between [Children's] best interests and [Children's] legal interests.

9. This court finds that terminating the parental rights of Mother will best meet the developmental, physical, emotional needs, and welfare of [Children].

10. It is hereby **Ordered, Adjudged, and Decreed** that the parental rights and duties of [Mother] to [Children] … are forever terminated. This termination extinguishes the power and the right of [Mother] to object to or receive notice of the adoption proceedings.

11. The adoption of [Children] may continue without further notice to or consent of [Mother].

Termination Order, 8/1/23, ¶¶ 3-9 (emphasis in original).

Mother filed a timely notice of appeal and a contemporaneous concise statement of errors complained of on appeal, *see* Pa.R.A.P. 1925(a)(2)(i), at each docket. The orphans' court filed Rule 1925(a) opinions. This Court consolidated the appeals *sua sponte*.

Mother raises a single issue on appeal: "Whether the [orphans'] court committed an error of law and/or abused its discretion in terminating [] the parental rights of [Mother] to her Children?" Mother's Brief at 4 (some capitalization altered).

We apply a deferential standard of review in appeals from orders terminating parental rights:

The standard of review in termination of parental rights requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or

abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In the Interest of: J.R.R.*, 229 A.3d 8, 11 (Pa. Super. 2020) (citation omitted).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *See In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). The clear and convincing evidence standard "is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation and internal quotation marks omitted).

Here, the orphans' court terminated Mother's parental rights pursuant to Section 2511(a)(2), (5), and (b). This Court may affirm the orphans' court's decision to terminate parental rights if we agree with its determination concerning any one subsection of Section 2511(a), as well as Section 2511(b). *See In re Adoption of C.D.R.*, 111 A.3d 1212, 1215 (Pa. Super. 2015). We focus our analysis on Section 2511(a)(2) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following ground:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the condition and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. …

23 Pa.C.S.A. § 2511(a)(2), (b).

To satisfy the requirements of section 2511(a)(2), the petitioner must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted).  Grounds for termination under this subsection "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.*; *see also In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) ("[S]ubsection (a)(2) does not emphasize a parent's refusal to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control of subsistence necessary for his physical or mental well-being."

(citation omitted)). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019).

Mother claims she has remedied the conditions leading to Children's placement.[8] Mother's Brief at 12. Mother asserts:

> [Mother] successfully completed and graduated from the [DRC]. As part of the DRC program, [Mother] reported daily to the center, attended several classes each week, had daily check-ins and passed drug screens. She had no positive drug screens[,] and there were no relapses from the point of her admission[. Mother] attended all office appointments and checked in regularly by phone. [Mother] maintained employment as a manager of McDonald's and maintained an appropriate home residence. She began the DRC program in May 2019 and graduated in March 2020. In order to graduate from the program, [Mother] overcame many issues that she previously struggled with and, unlike many participants, completed the program quickly and efficiently due to her motivation to get her life on track and have her children returned to her.

*Id.* at 12-13 (citations to record omitted). Mother acknowledges two instances in which Aunt believed Mother was under the influence, but Mother credits her appearance during those incidents to being in "an obvious emotional state." *Id.* at 13. Mother maintains she has not used drugs or alcohol in three years. *Id.* at 15.

---

[8] Mother focuses her argument almost exclusively on the requirements of subsection 2511(a)(5). *See* 23 Pa.C.S.A. § 2511(a)(5) (permitting termination where "[t]he child has been removed from the care of the parent … for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time" even with the provision of reasonably available services and assistance).

During the termination hearing, Aunt offered the testimony of Ms. Lutch, the Agency supervisor who had worked with the family during the dependency proceedings. Ms. Lutch testified that Children were placed in the Agency's care on February 21, 2018, after the incident in which L.T.P. called 911 because Mother was unresponsive. N.T., 4/10/23, at 6. The Agency "was extremely concerned about the condition of the home and the fact that [Mother] appeared to have drug and alcohol concerns." *Id.*; *see also id.* (describing the condition of the home as "deplorable"). Ms. Lutch indicated that needles, bottles, and prescription medications were located where Children had access. *Id.* at 7. Mother also had drug paraphernalia throughout the home, including "thousands" of stamp bags. *Id.* The Agency provided services based on its concerns of Mother's drug and alcohol use, and her ability to maintain a stable, safe home. *Id.*

According to Ms. Lutch, the Agency provided services until July 2019, when the Agency recommended that Children be placed with Aunt. *Id.* at 7-8. The Agency then provided monitoring services for the first few months Children were in Aunt's care. *Id.* at 8. Further, the Agency requested that Mother be ruled out as a placement option and precluded from visitation "due to concerns that [Mother] had not successfully completed or had been cooperating with drug and alcohol treatment." *Id.*

By July 2019, Children had been in the Agency's custody for 16 months. *Id.* at 10. Mother failed to receive or complete drug and alcohol counseling

during that time, and she was unable to maintain stable housing. *Id.* Ultimately, in November 2019, the Agency recommended that Children remain in the care and custody of Aunt. *Id.* at 12. Ms. Lutch testified that after a hearing on November 12, 2019, the juvenile court terminated court supervision over Children. *Id.*, Petitioner's Exhibit 4 (Order for Termination of Court Supervision).[9]

Next, Mr. Maul testified concerning Mother's participation at the DRC. Mr. Maul testified that Mother reported to the DRC on May 23, 2019. *Id.* at 22. Mother completed a 90-day incarceration for a violation of DRC policies, but she returned to the DRC on September 9, 2019. *Id.* at 22, 29. Mr. Maul testified that Mother successfully completed the program on March 10, 2020, without any absences or positive drug screens. *Id.* at 22. According to Mr. Maul, Mother had to pass drug and alcohol tests to complete her DRC program. *Id.* at 23.

Aunt testified that between the time of Father's death and Children's removal from Mother's home in February 2018, Aunt had monthly contact with Children. *Id.* at 34. While Children were in the Agency's custody, Aunt "had … a respite care … just about every other weekend…. Those arrangements were made between [Aunt] and the foster families." *Id.*

---

[9] Ms. Lutch acknowledged that she was unable to address whether the conditions leading to placement had changed after the Agency ceased involvement. *See* N.T., 4/10/23, at 18.

Aunt testified that in April or May 2019, the Agency inquired whether she would be interested in providing permanency for Children. *Id.* at 36. Aunt initially chose to pursue legal guardianship, rather than involuntary termination of Mother's parental rights, because she was concerned for "[C]hildren and their well-being, their emotional state, their mental state." *Id.* at 37.

> [Children] were still trying to come to terms with … not having a father. Then, they were just removed from their [M]other's care; had been out of their [M]other's care all this time and w[ere] hanging onto hope that [Mother] would do what she needs to do so they could go home. So at that time when talking to the [C]hildren, they … were very, very upset and confused and I thought that to rip them completely from their [M]other's life at that time would just totally devastate them because at that time that was the only parent that they knew.

*Id.*

Further, Aunt stated that she was aware that Mother had "drug issues" prior to Children's removal. *Id.*; *see also id.* at 38 (explaining that two of the children were born addicted to controlled substances). Aunt testified that she often interacted with Maternal Grandfather when returning Children after a weekend visit, and Maternal Grandfather would tell Aunt that Mother was sick or sleeping. *Id.* at 39. Aunt recalled an interaction in January or February 2018, during which she observed marks on Mother's wrists, which Aunt believed were track marks associated with intravenous drug use. *Id.*

Citing the orphans' court's custody order, Aunt testified that Mother was required to complete drug and alcohol treatment. *Id.* at 40. However, Aunt

never received confirmation that Mother had completed treatment. *Id.* at 41,

50. Aunt described Mother's attempts to visit Children as follows:

> Initially, [Mother] would reach out to me and say, you know, could she and her parents come up to visit the [C]hildren. At that time[,] I allowed them to come to my house to have visitation. So she probably requested that every month, maybe more, maybe for a year. … Then, her mother became ill. It was difficult for [Mother] to travel to my house, so I offered to bring the [C]hildren down to the grandparents' house and, then, would let [Mother] know that I was bringing the [C]hildren down and she could visit with them at that location. So we did that a few times. Then, … [Mother's] visit requests became very inconsistent. It wasn't monthly anymore.
>
> [Mother] did reach out to me, I believe it was in June of 2021. [Mother's] parents were celebrating an anniversary and she was having her sisters come in with their children[,] and she wanted me to … have the [C]hildren participate in that. I was agreeable to that. So … I took the [C]hildren down to her parents' house. Their houses are, like, right beside each other. … We spent probably about [] six hours there that day, which is longer than we've ever done[. B]ut, then, after that point, I had not heard from [Mother]. It was probably right before school was ready to start where she would text and say, can I talk to the [C]hildren. If they wanted to talk to her on the phone, they would talk to her. Then, it was -- I mean, it wasn't even monthly. …
>
> Then, when we got to 2022, I believe [Mother] requested visitation three times that entire year. [Mother] saw [Children] five times, though, because in September of 2022, she did reach out to me and say that [Maternal Grandmother] had passed away. So I did take the [C]hildren down to the funeral home for the viewing and services, so [Mother] did see them there. And, then, when it was Christmastime, I reached out to [Maternal Grandfather] because the [C]hildren had a Christmas present for him and asked if I could bring the [C]hildren down…. I extended the invitation to [Mother] and said we'll be at your father's house if you'd like to come over[. B]ut she only requested three visits that entire year.

*Id.* at 42-43; *see also* N.T., 6/7/23, at 8 (reiterating that Mother saw Children five times in 2022, including three visits, the funeral, and Christmas). Aunt offered into evidence her own documentation of the dates, times, and locations of visits between Mother and Children. N.T., 4/10/23, at 43, Petitioner's Exhibit 5.

Aunt also voiced concerns that Mother was still using drugs. *See id.* at 46; *see also id.* at 36-37 (explaining she had previously seen Mother under the influence of drugs while Father was still alive and was familiar with how Mother acted when intoxicated). In particular, Aunt recalled her interaction with Mother during Maternal Grandmother's funeral:

> I felt that [Mother] was under the influence of something. She did not seem to be acting appropriately. Just her eyes were glazed over. These are just my perceptions. Being somewhat inappropriate with the [C]hildren. Not an appropriate setting.

*Id.* at 46-47. During Christmas 2022, when Mother joined Children and Aunt's visit with Maternal Grandfather, Aunt believed Mother was once again under the influence:

> Clearly I felt that she was under the influence of something. I can't say what. Based on her behaviors just kind of slumping down on the floor and just a long, drawn-out conversation and the repeating of the same thing over and over and over again … and not really engaging with the [C]hildren. Just her demeanor was very, very concerning to me.

*Id.* at 47; *see also id.* at 48 (stating, "[C]hildren were not even acknowledging [Mother] at that point.").

Ultimately, Aunt decided to file the instant termination petition. She explained,

> Because I feel that after the several years [Children have] been in with me, they are getting older, they are having their own thoughts and feelings. [Children] do not want -- there is no relationship with [Mother]. They don't want to have a relationship with her. When we do schedule visits, there have been several visits where [L.T.P.] just -- he does not want to attend. And when we do schedule the visits, … [Children are] doing it out of a sense of obligation because they think they have to. So just seeing how stable they are, how established they are, how happy they are, seeing [Mother's] behavior at Christmastime, seeing [M.C.P.[10]] in absolute tears, shaking, nervous, I just felt the damage is not repairable.

*Id.* at 50-51 (footnote added).

Regarding Mother's housing, Aunt acknowledged Mother has resided in the same house for approximately three years. N.T., 6/7/23, at 11. However, Aunt testified that she had never been inside Mother's home. *Id.* Aunt also testified that Mother has never asked to attend Children's doctor's appointments or parent-teacher conferences at school. *Id.* at 31. Mother did not attempt to contact or visit with Children after these proceedings were initiated. *Id.* at 33.

Upon review, we discern no error or abuse of discretion, as the record supports termination under Section 2511(a)(2). Though Mother cites

_____

[10] Aunt testified that during the Christmas 2022 visit, Mother pulled M.C.P. aside and stated that she would try to have Children returned home to Mother. N.T., 4/10/23, at 49. According to Aunt, M.C.P. became very distraught and anxious after this interaction. *Id.*

improvements in terms of her housing stability and sobriety, our analysis under Section 2511(a)(2) does not require consideration of a parent's attempts to remedy the conditions leading to placement. Rather, as explained above, the proper inquiry is whether Mother has displayed continued parental incapacity that cannot or will not be remedied. *See In re A.H.*, 247 A.3d at 443; *see also In re Z.P.*, 994 A.2d at 1118 (explaining that a court may terminate parental rights under Section 2511(a)(2) "when a parent has demonstrated a continued inability to conduct [her] life in a fashion that would provide a safe environment for a child, whether that child is living with the parents or not…." (citation omitted)).

The record in this case reflects that Children have resided with Aunt continuously since August 2019, and Aunt has had legal custody of Children since November 2019. The testimony presented during the hearings, and Aunt's own documentation, reflect that Mother participated in regular monthly visits with Children through approximately June 2021. *See* Petitioner's Exhibit 5. After that time, Mother made only infrequent and sporadic attempts to contact or visit with Children. *See id.* The evidence therefore supports the orphans' court's determination that Mother's incapacity cannot or will not be remedied.

Because the evidence supports termination under Section 2511(a), we next examine Children's needs and welfare pursuant to Section 2511(b). *See In re K.Z.S.*, 946 A.2d 753, 760 (Pa. Super. 2008). "The plain language of

Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the primary consideration must be the child's developmental, physical and emotional needs and welfare." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (quotation marks omitted).

This Court has repeatedly stated that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.W.U., Jr.*, 33 A.3d 1, 6 (Pa. Super. 2011) (citation omitted). "[T]he court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Interest of: J.R.R.*, 229 A.3d 8, 12-13 (Pa. Super. 2020) (citation and quotation marks omitted).

Mother asserts that she has a "strong bond" with Children, which "has only recently deteriorated due to parental alienation throughout the period of time that her [C]hildren were placed with [Aunt]." Mother's Brief at 16.

Conversely, in her brief on behalf of Children, Attorney Lehmier agreed with the orphans' court's decision to terminate Mother's parental rights:

> By all accounts, [Children] are bonded to [Aunt] and thriving in her care. The record, including the testimony of the [Children], indicates their physical, emotional and developmental needs are being met by [Aunt]. While Mother has been attempting to address the issues in her own life over the past several years, [Aunt] has been performing all parental duties for [Children].
>
> ….
>
> As of the time of the first termination hearing, [Children] had been living with [Aunt] for nearly five (5) years. This is the home they now know and all of them have expressed a desire to

- 17 -

remain there. [Children] have bonded with [Aunt], look to [Aunt] to meet all of their needs and are flourishing emotionally, physically and developmentally. The [orphans'] court fully considered the bond between Mother and [Children] and the effect that termination would have on the emotional needs and welfare of [Children]. … [Aunt] has provided [Children] with stability and permanency for many years. [Aunt] has remained the calming influence in [Children's] chaotic lives -- which serves their best interests and should continue with them being freed for adoption.

Brief for Children at 8-9.

During the termination hearing, Aunt testified that Children are doing well in school, with excellent attendance, and are involved in many activities. N.T., 6/7/23, at 8, 30. Aunt confirmed that Children are happy and want permanency. *Id.* at 5. Additionally, Aunt testified regarding her bond with Children:

[M]y relationship with all three of them is phenomenal. We have bonded so well. When [Children] first came, it was … an adjustment for them, but they are very resilient. They … settled in very quickly. The bond we created is fantastic. [Children] come to me for everything. I provide for [Children] everything that they need as a mother would. I provide their basic needs, their physical needs, their emotional needs, their mental health needs, their enjoyment. … [Children] come to me for guidance. They come to me for advice. They come to me when they have a problem. It's very loving. It's a very loving relationship. …

*Id.* at 7. Aunt testified that she views Children as her own, rather than as her nieces and nephew. *Id.* According to Aunt, Children become visibly nervous and anxious when they are around Mother. *Id.* at 9. Aunt also testified that Children exhibited "extreme joy" when she discussed with them the possibility of adoption. *Id.* at 29.

Children also testified during a separate hearing. L.T.P., who was 13 years old at the time of the hearing, indicated that he wished to remain with Aunt. N.T., 6/29/23, at 8, 9. He also testified that he did not want to have any contact with Mother. *Id.* at 10. L.T.P. explained that Mother had "done some pretty bad things to us, … our whole family that … I don't like. She's lied about a lot of things that I can never … really know the truth about now." *Id.*

Next, M.C.P., who was 11 years old at the time, testified that she does not wish to have contact with Mother. *Id.* at 18, 19. She explained, "[Mother] lies a lot." *Id.* at 18. Additionally, M.C.P. testified that Aunt always told Children when Mother called and asked whether Children wished to speak with Mother. *Id.* at 20.

S.C.P., who was 10 years old at the time of the hearing, testified that she likes living with Aunt. *Id.* at 22. S.C.P. stated that she is comfortable living with Aunt, as she has lived there for several years, and Aunt takes good care of Children. *Id.* at 23. S.C.P. also indicated that it was Children's decision not to speak to Mother on the phone. *Id.*

Based upon the foregoing evidence, the orphans' court concluded Children's needs and welfare were best served by terminating Mother's parental rights. *See* Termination Order, 8/1/23, ¶¶ 5-9. The record confirms that Children are bonded with Aunt, who has been providing for their physical, developmental, and emotional needs for several years. Our review reveals no

error or abuse of discretion by the orphans' court in terminating Mother's parental rights under Section 2511(b). Accordingly, we affirm the orders terminating Mother's parental rights to Children.

Orders affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 01/29/2024